# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

B A C HOME LOANS SERVICING LP )
F/K/A COUNTRYWIDE HOME LOANS )
SERVICING LP, )
                        )
         Plaintiff, )
    v. )        C.A. No. N10L-01-106 ALR
                        )
DIANA P. CUNNINGHAM AND )
ANDRE CUNNINGHAM, )
                        )
         Defendants. )

## ORDER SCHEDULING EVIDENTIARY HEARING

This is a mortgage foreclosure case. As set forth below, the actual dealings between the parties diverge from the legal posture presented in the court proceedings. Upon consideration of statutory and decisional law; the Superior Court Rules of Civil Procedure; the facts, arguments, and legal authorities set forth by the parties; and the entire record in this case, the Court hereby finds as follows:

**I.**     **The 2007 Mortgage and Note**

1. Plaintiff is a Delaware limited partnership that operates as a subsidiary of Bank of America, N.A. ("Bank of America"). Defendants are individuals and citizens of Delaware who are self-represented litigants.

2. On June 13, 2007, Defendants executed a promissory note ("Note") for a $600,619 loan in favor of the Note's original holder, Countrywide Bank,

FSB, a subsidiary of Countrywide Financial Corporation (collectively "Countrywide"). On the same day, Defendants executed and delivered a mortgage on their home ("2007 Mortgage") as security for the Note.

3. The 2007 Mortgage permits the sale or transfer of the Note, together with the 2007 Mortgage, without prior notice to the mortgagor.[1] The 2007 Mortgage provides that the sale or transfer of the Note and/or 2007 Mortgage may result in a change of the mortgagor's loan servicer.[2] By the 2007 Mortgage's terms, the loan servicer assumes certain rights under both documents, including the collection of periodic payments.[3] The 2007 Mortgage allows the holder of the Note to foreclose on Defendants' home if Defendants fail to make timely payments at the contract rate.[4]

4. In July of 2008, Bank of America acquired Countrywide as part of a stock-for-stock merger transaction valued at approximately $4.1 billion.[5] The merger coincided with the 2007-2008 United States subprime mortgage crisis, and shortly preceded Federal Trade Commission charges against Countrywide for

---

[1] 2007 Mortgage at ¶ 20.
[2] *Id.* The 2007 Mortgage also provides that "[t]here also might be one or more changes of the Loan Servicer unrelated to a sale of the Note." *Id.*
[3] *Id.*
[4] *Id.* at ¶ 9.
[5] *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1221 (C.D. Cal. 2012).

deceptive loan servicing practices aimed at increasing profits from default-related service fees during hard economic times.[6]

5. Bank of America obtained substantially all of Countrywide's home mortgage business.[7] Countrywide became a wholly owned subsidiary of Bank of America. Bank of America ceased using the Countrywide name in April 2009.[8] As a Bank of America home mortgage subsidiary, Plaintiff is the current owner of the Note.

6. Defendants have had three separate loan servicers since 2008. Bayview Loan Servicing, LLC ("Bayview") was Defendants' first loan servicer. OCWEN Loan Servicing, LLC ("OCWEN") was Defendants' second loan servicer.[9] Caliber Home Loans, Inc. ("Caliber") is Defendants' third and current

---

[6] *See* Press Release, F.T.C., Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), https://www.ftc.gov/news-events/press-releases.2010/06/countrywide-will-pay-108-million-overcharging-struggling.

[7] *Allstate Ins. Co.*, 842 F. Supp 2d at 1222.

[8] *SEC v. Mozilo*, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

[9] OCWEN has come under significant scrutiny from both consumers and financial regulators for its loan servicing practices, including questionable modifications and wrongful initiation of foreclosure proceedings. *See* Michael Corkery, *Mortgage Servicer Ocwen Subpoenaed by S.E.C. Over Its Business Ties*, N.Y. TIMES (Aug. 19, 2014), http://dealbook.nytimes.com/2014/08/19/ocwen-subpoenaed-by-s-e-c-related-to-its-business-ties/; Peter Eavis, *Regulator Finds Deficiencies With Mortgage Servicer Ocwen Financial*, N.Y. TIMES (Dec. 16, 2014), http://dealbook.nytimes.com/2014/12/16/regulator-finds-deficiencies-with-mortgage-servicer-ocwen-financial/; James Sterngold & Alan Zibel, *Ocwen Head to Resign in New York Settlement*, THE WALL STREET JOURNAL (Dec. 22, 2014), http://www.wsj.com/articles/ocwen-head-to-resign-in-new-york-settlement-1419224476. The propriety of OCWEN's financial services has also been the center of federal litigation in jurisdictions throughout the United States. *See, e.g., Bridge v. Ocwen Fed. Bank, FSB*, 681 F. Supp. 3d 355 (6th Cir. 2012); *Poynter v. Ocwen Loan Servicing, LLC*, 2016 WL 5380926 (W.D. Ky. Sept. 23, 2016); *Delgado v. Ocwen Loan Servicing, LLC*, 2016 WL 4617159 (E.D. N.Y.

loan servicer. The record does not reflect the time periods during which each entity serviced the loan at issue.

7. According to Defendants, at some point during 2010, Defendants entered into a valid and enforceable modification of the 2007 Mortgage ("2010 Modification"),[10] pursuant to which Defendants made payments for a six-month period. According to Defendants, after accepting payments for six months, the loan servicing entity began refusing payments and returned all payments received during the six-month period.[11]

8. In the meantime, also in 2010, Plaintiff filed suit against Defendants and served process based on the 2007 Mortgage.

9. According to Plaintiff, at some point during 2012, an offer for a second modification of the 2007 Mortgage was made to Defendants by OCWEN ("2012 Modification Offer").[12] Defendants allege that they never received the 2012 Modification Offer, and Plaintiff could not establish that OCWEN ever actually relayed the offer to Defendants. Defendants represented to the Court that

---

Sept. 2, 2016); *Cornejo v. Ocwen Loan Servicing, LLC*, 151 F. Supp. 3d 1102 (E.D. Cal. 2015); *Lage v. Ocwen Loan Servicing, LLC*, 145 F. Supp. 3d 1172 (S.D. Fla. 2015); *Abraham v. Ocwen Loan Servicing, LLC*, 2014 WL 5795600 (E.D. Pa. Nov. 7, 2014); *Drake v. Ocwen Fin. Corp.*, 2010 WL 1910337 (N.D. Ill. May 6, 2010).

[10] During a hearing on Plaintiff's Petition for Writ of Possession on September 27, 2016, Defendants presented a document evidencing the 2010 Modification.

[11] It is not clear whether the loan servicing entity that eventually disavowed the 2010 Modification was Bayview or OCWEN.

[12] A document stating OCWEN's 2012 Modification Offer was presented to the Court during a hearing on Plaintiff's Petition for Writ of Possession on September 27, 2016.

they would have accepted the 2012 Modification Offer if it had been relayed to them.

10. Plaintiff's most recent position is that loan modification is no longer an option for Defendants.

## II. The Foreclosure Proceedings

1. On January 13, 2010, Plaintiff filed a Complaint in Superior Court seeking entry of judgment against Defendants for the principal sum owed on the Note after Defendants allegedly failed to make timely payments pursuant to the 2007 Mortgage, which was attached to the Complaint as "Exhibit A."

2. From February 19 to March 3, 2010, the Sheriff's Office made four attempts to serve process on Defendants at Defendants' listed address. Service of process was unsuccessful during this period.

3. On May 28, 2010, the Sheriff's Office served process on Defendants.

4. By Letter dated April 21, 2011, after the case docket reflected an extended period of inactivity, the Court requested Plaintiff provide a status update.

5. By Letter dated April 22, 2011, Plaintiff requested the Court to transfer the case to the Dormant Docket pending the outcome of an agreement between Plaintiff and Defendants whereby Plaintiff allowed Defendants additional time to cure their default.

6. On April 25, 2011, the case was transferred to the Dormant Docket.

7.    By Letter dated May 11, 2011, after only two weeks on the Dormant Docket, Plaintiff requested the Pronthonotary to return the case to active status.[13]

8.    Also on May 11, 2011, Plaintiff moved for default judgment against Defendants pursuant to Rule 55(b)(1) of the Superior Court Rules of Civil Procedure for the amount owed under the Note and 2007 Mortgage.

9.    On July 11, 2011, the Court awarded default judgment against Defendants by virtue of a Writ of Levari Facias.[14]

10.    A Sheriff's sale of Defendants' property was scheduled for September 12, 2011.  The Sheriff's sale of Defendants' property was stayed multiple times between September 2011 and November 2015.

11.    On January 12, 2016, Defendants' property was purchased by Plaintiff as the highest bidder at Sheriff's sale.[15]

12.    On April 19, 2016, Plaintiff filed a Petition for Writ of Possession of the property pursuant to 10 *Del. C.* § 5011.

---

[13] Plaintiff could not respond to the Court's inquiry as to why the case was on the Dormant Docket for only a two-week period. Plaintiff's current counsel contacted Plaintiff's former attorney, who has no recollection as to why the case was on the Dormant Docket for such a short time, and has no access to relevant records or documents. However, the timing and change in Plaintiff's legal position may reflect the alleged timing and change in the loan servicer's position regarding the 2010 Modification.

[14] *See* 10 *Del. C.* § 5063.

[15] Plaintiff assigned its bid on Defendants' property to LSF9 Master Participation Trust on or about March 14, 2016.  Accordingly, Plaintiff requests that the Writ of Possession currently before the Court be awarded to LSF9 Master Participation Trust.

13. By Order dated May 25, 2016, this Court issued a Rule to Show Cause upon Defendants pursuant to 10 *Del. C.* § 5012. The Court ordered Defendants to appear to show cause as to why Plaintiff's Petition for Writ of Possession should not be granted.

14. On July 26, 2016, a hearing was held regarding Plaintiff's Petition for Writ of Possession ("July 26 Hearing"). During the July 26 Hearing, the parties presented inconsistencies in their communications and represented that the mortgage mediation process was ongoing. The July 26 Hearing was continued for sixty days to provide the parties additional time for mediation and to gather relevant documents.

15. On September 27, 2016, the hearing regarding Plaintiff's Petition for Writ of Possession resumed ("September 27 Hearing"). Plaintiff represented that OCWEN refused to engage in additional modification negotiations with Defendants.

16. At the conclusion of the September 27 Hearing, the Court ordered the parties to appear for an additional evidentiary hearing. This is the Court's Order scheduling the evidentiary hearing.

## III.  Legal Standard

1.  The Court has significant discretion in managing mortgage foreclosure proceedings in the interest of justice and equity.[16]

2.  "[A] mortgagor's defenses in a mortgage foreclosure action are limited to defenses to the mortgagor's obligations under the mortgage."[17]  In other words, the appropriate defense in a mortgage foreclosure action is a defense that is related to the terms of the mortgage itself.[18]  In the context of a mortgage modification, the Court must differentiate between valid contractual amendments to the original loan agreement and post-default negotiations.[19]  While mortgage modifications may be validly asserted by a mortgagee under the affirmative

---

[16] *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. v. Goldfelder*, 2014 WL 644442, at *3–4 (Del. Feb. 14, 2014) (affirming the Superior Court's broad discretion to consider a myriad of factors in interpreting Rule 69(d) of the Superior Court Rules of Civil Procedure in the context of a motion to vacate the sale of property on execution); *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) (citing *Petition of Adair*, 190 A. 105, 107 (Del. Super. 1936)) ("Judicial review of a contested sheriff's sale implicates the court's inherent equitable power to control the execution process and functions to protect the affected parties from injury or injustice."); *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983) ("The equitable power to disregard defects in the execution of a mortgage is based upon two equitable maxims. First, equity regards substance rather than form. Second, equity regards that as done which in good conscience ought to be done." (internal citations omitted)); *Mortg. Elec. Registration Sys., Inc. v. Johnson*, 2007 WL 2792242, at *2 (Del. Super. Sept. 25, 2007) (quoting *Burge*, 648 A.2d at 422) ("Although the Superior Court has concurrent jurisdiction with the Court of Chancery to foreclose on a mortgage, such proceedings are historically and remain inherently equitable."). *See also* 10 *Del. C.* § 5061(d) (granting the Superior Court the authority to make all necessary rules respecting the process, manner, required notice, and methods of proof relating to mortgage foreclosure proceedings).

[17] *McCafferty v. Wells Fargo Bank, N.A.*, 2014 WL 7010781, at *2 (Del. Dec. 8, 2014) (citing *Brooks v. BAC Home Loans Servicing, LP*, 2012 WL 337238, at *2 (Del. Aug. 23, 2012)).

[18] *McCafferty*, 2014 WL 7010781, at *3 (citing *Harmon v. Wilmington Trust Co.*, 1995 WL 379214, at *3 (Del. June 19, 1995)).

[19] *See Wells Fargo Banks, N.A. v. Williford*, 2011 WL 5822630, at *3 (Del. Super. Nov. 17, 2011).

8

defense of avoidance,[20] post-default negotiations are considered irrelevant to the validity or legality of the mortgage documents.[21]

3. Upon application of a writ of possession by the valid purchaser of a property sold on execution, the Court must grant a rule to show cause on a defendant who is in occupation of the sold property.[22] A writ of possession shall not issue until the Court makes the rule to show cause absolute.[23]

## IV. Questions of Law and Fact

1. There are legal and factual questions regarding whether the 2007 Mortgage is the controlling contract between the parties.

2. There are legal and factual questions regarding the validity of the default judgment requested by Plaintiff on the same day that the case was moved from the Dormant Docket.

3. The 2007 Mortgage and Note have a complex history since their acquisition by Plaintiff. Furthermore, Plaintiff has had multiple attorneys from

---

[20] *Id.* (citing *Gordy v. Preform Bldg. Components*, 310 A.2d 893, 893–94 (Del. Super. 1973)); *see also United States v. Golden Acres, Inc.*, 520 F. Supp. 1073, 1079 (D. Del. 1981) (recognizing that parties to a mortgage may make enforceable agreements modifying the terms of payment, and that in some circumstances a mortgagee's conduct may create an estoppel that bars foreclosure).

[21] *Christiana Falls, L.P. v. First Fed. Sav. & Loan Ass'n of Norwalk*, 1986 WL 18356, at *1 (Del. Dec. 30, 1986).

[22] 10 *Del. C.* § 5012.

[23] *Id.*

three different law firms since this case's inception in 2010.[24]   The 2007 Mortgage and Note's complicated chain of ownership and servicers in conjunction with Plaintiff's changes in counsel has resulted in inconsistent communications and confusion.   For example, Plaintiff has been unable to access relevant documents or fully respond to the Court's inquiries.[25]   Moreover, Defendants have represented that their communications with the various loan servicers have not been consistent with Plaintiff's presentations to the Court.[26]

---

[24] Although Plaintiff has undergone multiple changes in counsel of record, no substitutions of counsel are reflected on the case docket.

[25].     THE COURT: Did this matter get sent to the mortgage mediation program?
    COUNSEL FOR PLAINTIFF: I am not sure if it went through the opt in mortgage program that was in effect prior to January 2012, that was on the mandatory automatic mortgage foreclosure program went into effect. I know that prior to 2012, they would have notices, serviced with a complaint, that indicated that you could call the Attorney General's Office to opt into the program. Unfortunately, nothing was filed with the Court. So I am not sure if that is the program they participated in.

*BAC Home Loans Servicing LP v. Cunningham*, C.A. No. N10L-01-106 ALR at 11 (July 26, 2016) (TRANSCRIPT);
    COUNSEL FOR PLAINTIFF: As regards to the file being on the dormant docket for two weeks, I contacted the attorney who handled the matter at that time, [Plaintiff's former attorney]. Unfortunately, her prior firm filed for bankruptcy and went out of business, so she no longer has access to those records.

*BAC Home Loans Servicing LP v. Cunningham*, C.A. No. N10L-01-106 ALR at 1–2 (Sept. 27, 2016) (TRANSCRIPT);
    COUNSEL FOR PLAINTIFF: In regards to mediation, there were some questions as to whether the parties went through the mediation process through the courts. I contacted . . . the program administrator of the prior opt in program which was in effect before 2012, and she did not have any records of the parties participating in mediation through that program. So, any trial modification that they participated would have been outside the Court opt in program.

*Id.* at 2.

[26]     THE COURT: Did you make any other efforts as far as resolving this matter?
    MR. CUNNINGHAM: No, not that I am aware of. At that point we were not able to, not that I am aware of.

10

4. Plaintiff has been unable to provide any documentation relating to the 2010 Modification, although Plaintiff's counsel did not challenge Defendants' representations during the July 26 Hearing or the September 27 Hearing.[27]

5. According to Defendants, Defendants never received OCWEN's 2012 Modification Offer, and were unaware of the offer until it was provided by Plaintiff's counsel during mediation negotiations in 2016. The 2012 Modification Offer would have reduced Defendants' total loan balance by $417,354.46, and Defendants contend that they would have accepted this offer had they ever received it. Counsel for Plaintiff was unable to present proof of mailing for the 2012 Modification Offer.

6. The Court finds that the 2010 Modification may have a direct impact on the terms of the 2007 Mortgage itself. Defendants allege that a valid offer for modification of the 2007 Mortgage was accepted through payments that were made for a six-month period. Allowing the presentation of evidence regarding the alleged modification is an appropriate exercise of the Court's broad discretion in

> MS. CUNNINGHAM: I was talking to the mortgage companies, they were switching mortgage companies. We used to be with Bank of America, then it was Bank of America, and then I was, like, talking to Bank of America, then all of a sudden like I guess the mortgage company switched to Oxford? The Mortgage company kept switching you just keep talking to different people, trying to explain your case, they was like give you, I mean, papers they were giving me, we couldn't afford at that time.

*BAC Home Loans Servicing LP v. Cunningham*, C.A. No. N10L-01-106 ALR at 10 (July 26, 2016) (TRANSCRIPT);

[27] Plaintiff investigated the 2010 Modification to ascertain the validity of Defendants' allegations. Plaintiff was unable to access any information regarding the 2010 Modification because it was allegedly offered by Bayview, Defendants' first loan servicer.

11

the context of mortgage foreclosure proceedings that will allow Defendants an opportunity to establish whether there was "fraud, unfairness, or other extraneous matter demonstrating unfairness to one of the interested parties."[28] An evidentiary hearing will permit the Court to address outstanding questions of law and fact regarding whether the 2010 Modification is an enforceable contractual modification that supersedes the terms of the 2007 Mortgage, as opposed to part of post-default negotiations that are unrelated to the 2007 Mortgage's validity or legality.[29]

7.      The Court also finds that the default judgment sought and entered in 2011 may have lacked an adequate legal basis.

8.      The parties shall present evidence regarding whether the original terms of the 2007 Mortgage are valid and enforceable as a matter of law,[30] and whether default judgment should be vacated as "necessary to correct a plain injustice, inconsistent with principles of equity."[31]

---

[28] *Goldfelder*, 2014 WL 644442, at *2 (citing *Greenpoint Mortg. Funding, Inc. v. McCabe*, 2006 WL 3604784, at *1 (Del. Super. Nov. 27, 2006), *aff'd sub nom*, *Pac. W. Grp., Inc. v. Greenpoint Mortg. Funding, Inc.*, 933 A.2d 1250 (Del. 2007)).

[29] *See Christiana Falls, L.P.*, 1986 WL 18356, at *1. In the recent Delaware Supreme Court case of *Holsey v. Hynes*, appellant asserted that the Superior Court abused its discretion by refusing to set aside a sheriff's sale based upon "irregularities and unfairness in the loan process, which gave rise to the sheriff's sale proceeding." 2015 WL 2260114, at *4 (Del. May 11, 2015). The Supreme Court affirmed the Superior Court's decision to uphold the sale, in part, because the record did not contain the requisite evidentiary support for appellant's claim. *Id.*

[30] *See McCafferty*, 2014 WL 7010781, at *3.

[31] *Burge*, 648 A.2d at 421.

**NOW, THEREFORE,** this 11th day of October, 2016, Plaintiff's Petition for a Writ of Possession is hereby **DENIED** pending an evidentiary hearing. The parties are herby **ORDERED TO APPEAR** on February 2, 2017 at 9:30 a.m. to present evidence regarding whether the 2007 Mortgage is valid and enforceable as a matter of law, and/or whether the default judgment entered in favor of Plaintiff should be vacated as a matter of law or equity.

**IT IS SO ORDERED.**

*Andrea L. Rocanelli*

_____

**The Honorable Andrea L. Rocanelli**